**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **EMILIO CALDERON** | **CIVIL ACTION** |
| **VERSUS** | **NO. 20-1924** |
| **DARREL VANNOY, WARDEN** | **SECTION: "E" (5)** |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.    *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Emilio Calderon, is a convicted inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.[1]    In September 2014, Calderon was charged by grand jury indictment with one count of second-degree murder and one count of

---

[1] Although his application is captioned "Omilio" Calderon, that spelling conflicts with his signature and self-references to "Emilio" throughout the application. Since this appears to be a typographical error, as confirmed by the state-court record, the Court will use the name Emilio Calderon.

first-degree feticide.[2]    On September 24, 2015, a jury found Calderon guilty as charged.[3] On October 7, 2015, his motion for a new trial was denied and he was sentenced to life imprisonment without benefit of probation, parole or suspension of sentence on count one and 15 years' imprisonment on count two, to run consecutively.[4]

He was subsequently granted an out-of-time appeal.[5]    On direct appeal, his appointed counsel raised one assignment of error (*i.e.*, the trial court erred in granting the State's motion in limine and denied him the right to present a defense).    On April 12, 2017, the Louisiana Fifth Circuit Court of Appeal affirmed his conviction and sentence.[6]    He did not file an application for writ of certiorari with the Louisiana Supreme Court.

On or about April 12, 2018, Calderon submitted an application for post-conviction relief to the state district court.[7]    In that application, he raised three claims for relief:    (1) he was denied the right to appellate review based on an incomplete transcript of the proceedings; (2) prosecutorial misconduct occurred during opening statements and closing argument; and (3) the prosecutor violated *Batson* by using peremptory strikes in a discriminatory manner during jury selection.    Although he was granted additional time to

---

[2]  State Rec., Vol. 1 of 7, Grand Jury Indictment, Jefferson Parish.

[3]  State Rec., Vol. 1 of 7, Trial Minute Entries, 9/22/15 through 9/24/15.

[4]  State Rec., Vol. 1 of 7, Sentencing Minute Entry, 10/7/15.

[5]  State Rec., Vol. 1 of 7, State District Court Order, 7/8/16.

[6]  *State v. Calderon*, 2016-KA-690 (La. App. 5 Cir. 4/12/17), 220 So.3d 830; State Rec., Vol. 1 of 7. The case was remanded solely for correction of the commitment.

[7]  State Rec., Vol. 1 of 7, Uniform Application for Post-Conviction Relief.

file a supplemental brief and provided additional transcripts he requested, he failed to supplement the application.[8]    On August 16, 2019, the state district court denied relief.[9] The district court denied the first claim on the merits and the remaining claims as procedurally barred.    On September 18, 2019, the Louisiana Fifth Circuit Court of Appeal denied his supervisory writ application.[10]    On June 12, 2020, the Louisiana Supreme Court denied his application for supervisory writ of review.[11]

On or about July 2, 2020, Calderon filed the instant federal application for habeas corpus relief.[12]    In that application, he asserted the same three grounds raised in his state court post-conviction proceedings.    On September 9, 2020, the State filed a response.[13] The State concedes that the instant application is timely and that the claims were exhausted in the state courts.    The State argues that the claims should be denied on the merits and as procedurally barred.    Calderon did not file a reply.

---

[8]    State Rec., Vol. 1 of 7, District Court Orders, 4/27/18 and 5/1/18 (Tabs 2, 3); State Rec., Vol. 2 of 7, certified letter to Calderon enclosing transcripts, 6/21/18; State Rec., Vol. 3 of 7, District Court Order, 7/12/18 and 6/27/19 (Tabs 6, 7).

[9]    State Rec., Vol. 3 of 7, Order denying Post-Conviction Relief, 8/16/19.

[10]    State Rec., Vol. 3 of 7, *Calderon v. Vannoy*, 2019-KH-440  (La. App. 5 Cir. 9/18/19).

[11]    State Rec., Vol. 7 of 7, *Calderon v. Vannoy*, 2019-KH-01841  (La. 6/12/20);  *see also Calderon v. Vannoy*, 2020 WL 3424879.

[12]    Rec. Doc. 3, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus and Memorandum in Support.

[13]    Rec. Doc. 13.

**Facts**

On direct appeal, the Louisiana Fifth Circuit briefly summarized the facts adduced at

trial:

> Katherine Martinez was found strangled to death in her apartment on June 7, 2014. She was eight months pregnant. Years before, in 2007, when Katherine was sixteen years old, she immigrated to the United States with her mother, Orla Martinez. They initially settled in New York City; but after Katherine had finished high school, she and her mother moved to Gretna in 2011, where Katherine got a job and began pursuing a career in nursing. Katherine also maintained a social life, befriending Santos Reyes, Juan Lozano, and Emilio Calderon, defendant. Although she was romantically involved with each of these men to varying degrees at various points in time, the evidence suggests Katherine established a steady relationship with Mr. Lozano sometime in 2012 and became pregnant with his child in late 2013.[14]
>
> On the night of Saturday, June 7, 2014, Katherine and Mr. Lozano were to pick up Katherine's mother from the airport. Mrs. Martinez, who was in New York, had spoken with Katherine that morning, but was unable to get in touch with her after 1:00 p.m. eastern time. Growing concerned, Mrs. Martinez called Santos Reyes around 5:00 p.m. central time to see if he could get in touch with Katherine. Mr. Reyes sent several text messages to Katherine but got no response. At Mrs. Martinez's insistence, Mr. Reyes went to Katherine's apartment looking for her. The lights were out and nobody answered the door, so he assumed she was not home and he left.
>
> Mrs. Martinez arrived at the New Orleans airport around 11:00 p.m. Mr. Reyes picked her up and they went straight to Katherine's apartment in Gretna. They forced open the door and found Katherine unresponsive on the kitchen floor. Mr. Reyes immediately began administering first aid, but soon realized that Katherine was stiff and cold to the touch. After failed attempts to revive her with fingernail polish remover, they called 9–1–1.
>
> Detective Gabriel Faucetta of the Jefferson Parish Sheriff's Office ("JPSO") responded to the scene around 1:00 a.m. on June 8, 2014. Katherine lay face up on the kitchen floor in only a brassiere, shorts, and underwear. Several of her acrylic fingernails were broken off, suggesting a struggle had occurred. She had sustained several stab wounds.

---

[14] DNA tests confirmed that Juan Lozano was the father of the child.

The autopsy later confirmed Katherine's cause of death was asphyxia due to strangulation. This was also her unborn child's cause of death. It was determined that the five stab wounds had not caused her death because she had not lost a fatal amount of blood. It was estimated that Katherine had been dead between four and twelve hours at the time she was found.

Through his investigation, Detective Faucetta was put in touch with Katherine's boyfriend, Mr. Lozano, who agreed to meet with him at the detective bureau. Mr. Lozano was very cooperative: he answered the detective's questions, allowed officers to search his cell phone, and provided a DNA sample. Mr. Lozano also removed his shirt and permitted officers to examine his body for injuries or scratches. None were found. Officers searched Mr. Lozano's vehicle, house, and business, but located nothing of value. Through the use of cellular records, Detective Faucetta corroborated Mr. Lozano's whereabouts on June 7, 2014. Mr. Lozano was ruled out as a suspect. Similarly, Mr. Reyes agreed to meet with detectives, and was also very cooperative, allowing officers to search his cell phone, providing a DNA sample, and permitting an examination of his body, which did not reveal any injuries or scratches. Mr. Reyes' whereabouts on June 7, 2014 were also corroborated with his cellular records. He too was ruled out as a suspect.

As detectives continued their investigation, Mrs. Martinez advised them of troubling conversations she had with defendant through Facebook and WhatsApp, a text messaging application. The evidence suggested that defendant and Katherine had a falling out and that Katherine cut off communication with him, blocking him on social media. This prompted him to reach out to her mother. In a Facebook conversation on October 26, 2012, defendant told Mrs. Martinez that Katherine had hurt him but that he still loved her and did not know what to do.[15] Then, two days later, defendant messaged Mrs. Martinez asking for Katherine's phone number, explaining that "despite the insults, the lies, everything, I still love her and cannot forget her." On November 4, 2012, Mrs. Martinez relayed to defendant Katherine's message that she did not want to hurt him but it was best for him to forget about her. Months later, on April 7, 2013, defendant messaged Mrs. Martinez asking her to tell Katherine that he loved her, that she was the love of his life, and that he would wait his whole life for her. Over the next several months, defendant continued to communicate with Mrs. Martinez through Facebook, attempting to reunite with Katherine, with no success. Finally, in May of 2014, defendant asked Mrs. Martinez if Katherine was pregnant. Upon learning that she was, he responded with two emojis of crying faces.

---

[15]  It is noted that these conversations were originally in Spanish and were translated at trial by an interpreter.

Detective Faucetta decided to follow this lead and obtained defendant's cellular records. Analysis of these records revealed that on the morning of June 7, 2014, defendant's cell phone was in close range of the shipyard in Lafourche Parish where he was employed. As the day progressed, the records reflect that his cell phone gradually drew closer in range to the victim's apartment. At 2:05 p.m., his phone was within one mile of the victim's apartment. Thereafter, the records indicate that his cell phone drew progressively distant from her apartment and closer to the shipyard, where it finally stopped.

With this information, on June 10, 2014, Detective Faucetta coordinated with the Lafourche Parish Sheriff's Office to meet with defendant at the shipyard. Defendant agreed to accompany the detectives to the Lafourche Parish Sheriff's Office, where he was advised of his rights, agreed to waive them, and spoke with the officers. Defendant gave four recorded statements that day. Though defendant is able to communicate in English, his primary language is Spanish. Accordingly, in defendant's first two statements, Lieutenant Valerie Martinez of the Lafourche Parish Sheriff's Office assisted with translation. Detective Julio Alvarado of JPSO assisted in defendant's third and fourth statements.

In his first statement, which began at 4:34 p.m. and concluded at 4:52 p.m., defendant explained that he had known Katherine for two years and that they had intermittent sexual relations, but that they had not dated exclusively. He stated that he gave her money for a plane ticket to New York and $2,000 to buy a car. He claimed the last time he saw her was two weeks prior when they met in a hotel room to have sex. He denied being in Gretna over the weekend and stated that his cell phone was with him at all times over the weekend.

In his second statement, which began at 5:21 p.m. and concluded at 5:40 p.m., defendant began to change his story. He now acknowledged that he was in Gretna on June 7 because Katherine texted him and asked him to come to her apartment. He explained he went there around 2:00 or 3:00 p.m. to have sex with her. He was waiting in the parking lot when she texted him and told him that she could not see him because she was busy. So he left. He denied entering Katherine's apartment that day. He admitted that he loved her and that after she "de-friended" him on Facebook, he created an alias to continue to watch her.

After concluding the second statement, the detectives took a break and defendant was given some time to rest by himself. During this break, a search warrant was secured to obtain a DNA sample from defendant and to examine his body. This examination revealed scratches and bruises on his upper left chest.

The detectives questioned defendant about these injuries in his third statement, which began at 9:30 p.m. and concluded at 9:45 p.m. In this statement, defendant's story continued to change. He now admitted that he entered Katherine's apartment on June 7. He explained that when he arrived around 2:00 p.m., Katherine texted him and told him to come inside. They had sex on the sofa, and afterwards Katherine told him she had things to do, so he left. He disposed of the condom he had used in a garbage can outside her apartment. He estimated that he was in the apartment for approximately one hour. Defendant reiterated that he loved Katherine and stated that he was hurt and angry when he learned that she was pregnant with another man's child.

When the detectives questioned defendant about the scratches and bruises on his chest, he explained that he sustained those injuries at his job where he was frequently burned when welding. He denied being scratched by Katherine or being involved in a physical altercation with her. He denied killing Katherine.

In his fourth statement, which began at 10:11 p.m. and concluded at 10:37 p.m., defendant admitted to killing Katherine, but explained he did so because she attacked him. He again recounted that they had sex on the sofa, after which she asked him for $500. When defendant told her that he would give her the money another day, Katherine exclaimed, "Son of a bitch I want my money!" and began hitting defendant, who was not yet fully dressed and did not have his shirt on. He explained this was how he received the scratches and bruises on his chest. Katherine stopped momentarily, retreated to the kitchen, and came back with a knife. Continuing to scream at defendant, she "launched" forward to stab him. Defendant wrested the knife away from Katherine, who resumed striking him with her hands. Bothered, upset, and angry that she would not stop hitting him, defendant stabbed her once in the side and threw the knife to the kitchen floor. As she continued to scream and strike defendant, he grabbed her by the neck "to control her." She did not relent so defendant squeezed Katherine's neck tightly with one hand and pushed her up against the kitchen wall. She went lifeless and fell to the ground when he released his hand. Defendant grabbed Katherine's apartment key, the knife, and the condom, left the apartment, locked the door, and discarded the items in the dumpster outside. (A search of this dumpster turned up nothing). Defendant explained he did not go to Katherine's apartment that day with the intention of killing her. He did so because she attacked him and he expressed remorse about doing it.

Laura Oliver, a DNA analyst with the JPSO DNA Laboratory and a qualified expert in the field, conducted DNA analysis in this case. Ms. Oliver tested four of Katherine's acrylic fingernails, only three of which yielded usable DNA profiles. Each of these three nails contained two DNA profiles. In each nail, Ms.

Oliver found one of these profiles was consistent with that of Katherine, but could only draw a conclusion regarding the second DNA profile in just one of the three. In this third nail, Ms. Oliver excluded Juan Lozano and Santos Reyes as possible donors for the second DNA profile, but could not exclude defendant. From this, Ms. Oliver concluded that it was 1.1 billion times more likely that the two DNA profiles in this third nail were attributable to Katherine and defendant rather than attributable to Katherine and an unknown individual. Moreover, Ms. Oliver sent these DNA profiles from this third nail to Dr. Mark Perlin at Cyber Genetics in Pennsylvania to verify the results. Dr. Perlin concluded that the match between the DNA profile from the third nail and defendant was 134 million times more probable than a coincidence.

Ms. Oliver also conducted another DNA test focusing only on the Y chromosome exclusive to males. This test revealed that there was a 99.97% probability that the male DNA profile present in one of the fingernails belonged to defendant. Similarly, there was a 99.98% probability that the male DNA profile present in another fingernail belonged to defendant.[16]

### General Standards of Review

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.   A state court's purely factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and

---

[16] *State v. Calderon*, 20 So.3d at 831-35 (footnotes in original).

convincing evidence.").    With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002).    A state court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent.    *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010).    An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 572 U.S. 415, 426 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694.    A state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.    *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not

simultaneously unreasonable."). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Id*. (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The AEDPA's deferential standard of review under Section 2254(d) and *Williams*, 529 U.S. at 362, applies only to claims adjudicated on the merits by the state courts. 28 U.S.C. § 2254(d). With respect to claims that are not fully adjudicated on the merits in state court, the deferential AEDPA standards of review do not apply. *Cullen v. Pinholster*, 563 U.S. 170, 185-86 (2011); *Henderson v. Cockrell*, 333 F.3d 592, 597 (5th Cir. 2003). Instead, the federal courts review those claims under pre-AEDPA *de novo* standards of review. *Id*. at 598 (citing *Jones v. Jones*, 163 F.3d 285, 299-300 (5th Cir. 1998) (applying *de novo* standard of review to ineffective assistance of counsel claims that were raised in state court, but not adjudicated on the merits)); *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009).

**Claims for Relief**

A. *Incomplete Record and Transcript*

Calderon asserts that he was denied the constitutional right to full and fair appellate

review because he lacked a "complete record and complete transcript of his trial."[17]   He argues that "he was denied due process and equal protection of the laws… when the district court denied his motion for production of the transcripts of pretrial, trial, and post-trial proceedings in the instant case for the purpose of preparing his Supplemental Appeal Brief, which now also prejudices him in preparing his claims for post-conviction relief."[18]   In particular, he argues that the transcripts of opening statements, closing arguments and voir dire were not made a part of the direct appeal record.

The state courts unanimously rejected this claim on post-conviction review.   The state district court rejected the claim as vague, speculative and conclusory.   The Louisiana Fifth Circuit Court of Appeal upheld the district court's ruling, stating:

> [W]e find no abuse of the trial court's discretion nor error in its ruling denying relator's APCR. Regarding the first claim, relator appears to allege that he was wrongfully denied transcripts he claimed were necessary for him to file a *supplemental appellate brief* to this Court in his appeal, which in turn prejudiced him in preparing his claims for post-conviction relief. Relator mistakenly claims that it was the district court which denied his transcript requests, but the appeal record shows that while this Court granted relator's request to file a supplemental appellate brief, this Court denied his request to supplement the appellate record with additional transcripts. However, relator did not seek review of the denial, nor did he actually file a supplemental brief with this Court. It is noted that relator was represented by the Louisiana Appellate Project in his appeal who apparently found the transcribed record adequate for briefing purposes. Furthermore, as the State noted in its response to the APCR, relator was furnished with the requested transcripts of the *voir dire* and opening and closing statements in June of 2018. The official record also reveals that relator requested and was granted an extension of time within which to file his APCR based on his recent receipt of the aforementioned transcripts. Considering the foregoing, we find no error in the trial court's ruling denying this claim.

[17] Rec. Doc. 3, p. 30.

[18] Rec. Doc. 3, p. 32.

The Louisiana Supreme Court denied the claim under Louisiana Code of Criminal Procedure article 930.2, because he failed to satisfy his post-conviction burden of proof.[19]

Although a criminal defendant has the right to adequate appellate and other review of his conviction based upon a sufficiently complete and accurate record, the Supreme Court has not held that due process requires a verbatim transcript of the entire proceedings or that an incomplete record confers automatic entitlement to relief. *Mayer v. City of Chicago*, 404 U.S. 189, 198, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971); *see also Higginbotham v. Louisiana*, 817 F.3d 217, 222 (5th Cir.), *cert. denied*, 137 S. Ct. 506 (2016). To prevail on a claim that the record was inadequate, a petitioner must prove that the missing portion of the transcript prejudiced his appeal in some manner. *Green v. Johnson*, 160 F.3d 1029, 1045 (5th Cir. 1998) ("[B]arring a showing that the [failure to record bench conferences during trial] resulted in 'actual prejudice,' habeas relief is unwarranted." (citation omitted)); *see also Mullen v. Blackburn*, 808 F.2d 1143, 1146 (5th Cir. 1987) (finding petitioner failed to show the absence of voir dire transcript prejudiced his appeal); *Bozeman v. Cain*, Civ. Action No. 09-8423, 2010 WL 2977393, at *4 (E.D. La. June 7, 2010), *adopted*, 2010 WL 2977402 (E.D. La. July 20, 2010) (finding that petitioner's claim failed when there was no actual prejudice resulting from the failure to transcribe a bench conference). Calderon has not shown prejudice in this case.

Calderon complains that the Louisiana Fifth Circuit denied his request for copies of additional transcripts, including voir dire and opening and closing statements, in connection

---

[19] *See* State Court Rulings at Rec. Doc. 3-1, Exhibit pp. 51-61.

with his motion to file a pro se supplemental brief on direct appeal, which denied him adequate appellate review for direct and collateral relief proceedings. However, as the state appellate court noted in reviewing this claim post-conviction, the record adequately sufficed for resolution of the one assigned error his appointed counsel asserted on direct appeal. Where, as here, the missing portions of the transcript were immaterial to the claim asserted on appeal, the record was adequate for full appellate review, and there was no denial of a meaningful appeal. *See Schwander v. Blackburn*, 750 F.2d 494, 497–98 (5th Cir. 1985) (explaining that petitioner was not denied a meaningful appeal where the omitted portions of the trial transcript were immaterial to the error alleged on direct appeal); *Thomas v. Cain*, Civ. Action No. 12-2818, 2013 WL 5960808, at *5 (E.D. La. Nov. 6, 2013) (finding that the record was adequate for resolution of appellate claims). Notably, Calderon did not pursue the direct-appeal claim in this federal application. Calderon has not shown that the missing transcripts of opening and closing argument and jury selection were material to his appeal, especially considering the alleged errors were not even properly preserved for appeal (as discussed more thoroughly in the next section of this report).

Moreover, as to his post-conviction proceedings, he fails to show that he lacked a complete record or that he suffered any prejudice with respect to his post-conviction claims. It is well-settled that the State is not "required to furnish complete transcripts so that the defendants ... may conduct 'fishing expeditions' to seek out possible errors at trial." *Jackson v. Estelle*, 672 F.2d 505, 506 (5th Cir. 1982). Calderon alleges only generally that he was unable to further substantiate and develop his claims. However, the record directly contradicts this assertion. In fact, the state court record confirms that during collateral

review proceedings Calderon was provided with the transcripts he requested.[20]   After receiving the records, he was then given more time to supplement his state-court application for post-conviction relief.   He failed to supplement his post-conviction application and instead sought prompt resolution of his pending post-conviction claims, as originally set forth.[21]   The district court complied and subsequently denied relief based on his original submission.   Therefore, Calderon has not shown that the state courts' denial of relief on this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.   He is not entitled to relief on this claim.

### B-C.   Procedural Default - Prosecutorial Misconduct and Batson Violation

In his second claim, Calderon argues that the prosecutor's improper remarks during opening statement and closing argument denied him a fair trial.   He alleges, "to the best of his memory," that the prosecutor called him a liar and asked the jury to "imagine being strangled, thereby asking the jury to put themselves in the place of the victim which is not allowed."[22]   He does not point out where this comment was made in the transcript of the proceedings.   The claim was raised in post-conviction relief proceedings and rejected as

---

[20]   State Rec., Vol. 2 of 7, June 2018 certified letter from Chief Court Reporter to Calderon, enclosing copy of trial proceedings including voir dire, opening and closing arguments, and bench conferences, pre-trial and post-trial motions filed and pre-trial and post-trial hearings.

[21]   State Rec., Vol. 3 of 7, Petitioner's Notice of Intent, 6/13/19 and May 2019 letter to the district court entitled, "Status Check Seeking Disposition and Ruling Date" and District Court Order, 6/28/19 (lifting the stay and ordering the State to respond to the PCR).

[22]   Rec. Doc. 3, p. 40.

procedurally barred under Louisiana Code of Criminal Procedure article 930.4(B), because although he had knowledge of the claim, he inexcusably failed to raise the claim in the proceedings leading to his conviction.    The Louisiana Fifth Circuit found no error in the district court's ruling and rejected any related allegations of ineffective assistance of counsel as unsubstantiated and conclusory.    The Louisiana Supreme Court likewise cited article 930.4 in denying relief.

In his third claim, Calderon argues that the prosecutor violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by using peremptory strikes in a discriminatory manner to remove potential jurors based on their race.    Again, he does not point out where in the transcript of voir dire proceedings this occurred.    The claim was raised on post-conviction relief and rejected under Louisiana Code of Criminal Procedure articles 930.4(B) (for failure to raise in the proceedings leading to conviction), and also under subsection (C), because even if an objection arguably was made during trial proceedings, the claim was not raised on direct appeal.    The Louisiana Fifth Circuit found no error in the state district court denying the claim as procedurally barred.    The Louisiana Supreme Court likewise cited article 930.4 in denying relief.

With respect to procedurally defaulted claims, the United States Fifth Circuit Court of Appeals has held:

> A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision. To satisfy the "independent" and "adequate" requirements, the dismissal must "clearly and expressly" indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims. This rule applies to

state court judgments on both substantive and procedural grounds.

*Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted).    Here, the procedural rules on which the state courts relied satisfy the "independent" and "adequate" criteria.    It is well-established that Louisiana Code of Criminal Procedure articles 930.4(B) and (C) constitute independent and adequate state court grounds sufficient to procedurally bar the claims from federal habeas review.    *See*, *e.g.*, *Robinson v. Cooper*, Civ. Action No. 12-1327, 2013 WL 2154011, at *5 (E.D. La. May 2, 2013); *Brown v. Cain*, Civ. Action No. 11-2267, 2011 WL 7042222, at *8 (E.D. La. Dec. 20, 2011), *adopted*, 2012 WL 123288 (E.D. La. Jan. 17, 2012); *Thomas v. Cain*, Civ. Action No. 11-2408, 2011 WL 6046536, at *5 (E.D. La. Nov. 17, 2011), *adopted*, 2011 WL 6028779 (E.D. La. Dec. 5, 2011); *Young v. Travis*, Civ. Action No. 07-3542, 2011 WL 494811, at *8 (E.D. La. Jan. 13, 2011), *adopted*, 2011 WL 494802 (E.D. La. Feb. 4, 2011); *Jones v. Cain*, Civ. Action No. 10-0187, 2010 WL 3312592, at *5–6 (E.D. La. July 29, 2010), *adopted*, 2010 WL 3312594 (E.D. La. Aug. 19, 2010); *Green v. Cooper*, Civ. Action No. 06-1657, 2009 WL 87590, at *10 (E.D. La. Jan. 8, 2009).    Where, as in the instant case, the state courts have rejected a petitioner's claim based on an independent and adequate state procedural rule, "federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice."    *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999).    Calderon meets neither requirement.

"To establish cause for a procedural default, there must be something external to the petitioner, something that cannot fairly be attributed to him."    *Johnson v. Puckett*, 176 F.3d 809, 816 (5th Cir. 1999) (quotation marks omitted).    Objective factors that can constitute

cause include interference by officials that makes compliance with the state procedural rule impracticable, a showing that the factual or legal basis for the claim was not reasonably available to counsel, and ineffective assistance of counsel. *Romero v. Collins*, 961 F.2d 1181, 1183 (5th Cir. 1992). Calderon cites ineffective assistance of trial and appellate counsel as cause for his procedural default of these claims. However, he has never presented independent claims of ineffective assistance of counsel for review in the state courts, and therefore, the ineffective-assistance claims cannot be used to establish cause. A claim of ineffective assistance of counsel must itself be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451-52, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000) (holding that "ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim. And we held in [*Murray v. Carrier*, 477 U.S. at 488-89] that the principles of comity and federalism that underlie our longstanding exhaustion doctrine—then as now codified in the federal habeas statute, see 28 U.S.C. §§ 2254(b), (c)—require *that* constitutional claim, like others, to be first raised in state court") (emphasis in original). "If a petitioner fails to demonstrate cause, the court need not consider whether there is actual prejudice." *Matchett v. Dretke*, 380 F.3d 844, 848-49 (5th Cir. 2004) (quoting *Rodriguez v. Johnson*, 104 F.3d 694, 697 (5th Cir. 1997)).

Because petitioner has not met the "cause and prejudice" test, these claims are barred from federal review unless the application of the procedural bar would result in a "fundamental miscarriage of justice." To prevail on such a claim, a petitioner must "make a persuasive showing that he is actually innocent of the charges against him. Essentially,

the petitioner must show that, as a factual matter, he did not commit the crime for which he

was convicted." *Finley*, 243 F.3d at 220 (citations omitted).    However, the United States

Supreme Court has cautioned:

> To be credible, such a claim [of actual innocence] requires petitioner to
> support his allegations of constitutional error with new reliable evidence—
> whether it be exculpatory scientific evidence, trustworthy eyewitness
> accounts, or critical physical evidence—that was not presented at trial.
> Because such evidence is obviously unavailable in the vast majority of cases,
> claims of actual innocence are rarely successful.

*Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).    Calderon makes

no such allegation and presents no new evidence of the type or caliber referenced in *Schlup*.

Moreover, ample evidence of his guilt was introduced at trial.    Therefore, he has not

established that any miscarriage of justice will result from the application of the procedural

bar.    Accordingly, for the reasons expressed, Calderon's second and third claims for relief

are procedurally defaulted and should not be considered on federal habeas review.

Alternatively, the claims fail on the merits.    Calderon's second claim for relief

involves alleged prosecutorial misconduct.    He is unable to point to any specific

objectionable comment made in either opening statement or closing argument.    Instead,

he alleges only generally that the prosecutor called him a liar and asked jurors to imagine

being strangled as happened to the victim in this case.    The Court has fully reviewed the

transcript of opening statement and closing arguments and found no improper or

inflammatory prosecutorial remarks that denied Calderon a fair trial.

A prosecutor's comment does not present a claim of constitutional magnitude in a

federal habeas action unless it is so prejudicial that the trial was rendered fundamentally

unfair in violation of the Due Process Clause.    *Jones v. Butler*, 864 F.2d 348, 356 (5th Cir.

1988).    "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned.    The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations and quotations omitted); *accord Rogers v. Lynaugh*, 848 F.2d 606, 608 (5th Cir. 1988); *Bell v. Lynaugh*, 828 F.2d 1085, 1095 (5th Cir. 1987).    The prosecutor's remarks must be evaluated in the context of the entire trial.    *Greer v. Miller*, 483 U.S. 756, 765–66 (1987) (citing *Darden*, 477 U.S. at 179). Ultimately, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."    *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

As stated previously, the Court has reviewed the opening and closing transcripts and found no improper comments to which the defense objected.    In closing argument, the prosecution referred to Calderon not being truthful in the context of the direct evidence presented at trial.    He made four different statements to the police and his statement shifted and changed each time they confronted him with evidence that negated his previous account until he finally admitted in his fourth statement that he killed her.    He manipulated the statements and lied, the prosecution argued, in order to justify his actions.[23]    The prosecution also asked the jurors to "imagine someone getting strangled, holding their throat and squeezing it until they've lost all the oxygen in their brain that they collapse on

---

[23] State Rec., Vol. 2 of 7, Closing Statement Transcript, pp. 17-21.

the floor."[24]    The scenario was based on the trial evidence presented that the victim died from strangulation and to support the element of specific intent.    The prosecution's comments were phrased in a manner that asked jurors independently to consider and weigh the evidence presented at trial in the context of the question posed.    The remarks were neither inflammatory nor improper.    Jurors were also specifically instructed that opening statements and closing arguments made by the attorneys are not to be considered as evidence.    Absent extraordinary circumstances, jurors are presumed to follow the instructions given them by the court.[25]    *See Greer v. Miller*, 483 U.S. at 766 n. 8.    Viewed in the proper context of the entire trial, the comments did not deprive Calderon of a fair trial. *Darden*, 477 U.S. at 180-182.    He is not entitled to relief on this claim.

As for the *Batson* claim, Calderon fails to point to specific objectionable peremptory strikes in the state court record.    Instead he admits not reviewing the pertinent transcripts and alleges only generally that "potential jurors were excluded because of their race and gender, mainly African Americans."[26]    The record confirms that he had access to the full transcript of jury selection.    Therefore, his failure to specify where in the record this discriminatory practice occurred or provide any factual support for this claim renders it wholly unsubstantiated and meritless.    His conclusory allegation simply does not suffice to raise a constitutional issue for federal habeas review.

---

[24] *Id*. at 10-11.

[25] State Rec., Vol. 6 of 7, Trial Transcript (September 24, 2015), p. 119.

[26] Rec. Doc. 3, pp. 41-42.

Moreover, as the State notes, only one *Batson* challenge was even arguably made by the defense during voir dire proceedings.    This occurred during a backstrike of Mr. Beverly, juror number 54 from panel number one.    After *Batson* was mentioned by the defense without any accompanying explanation, one of the prosecutors explained that Mr. Beverly had stated that a life sentence could affect his deliberation.    The other prosecutor commented, "Well, that's true. I don't believe a prima facie case has been made."    Defense counsel simply replied, "Okay."    The trial court did not engage in the exchange at all.    The juror was then excused by the trial court.[27]    No further defense objection was noted.    In reviewing the post-conviction claim and applying article 930.4(B), the state district court expressed doubt that this constituted a *Batson* objection.    This Court is also skeptical. Defense counsel seemed to accept and fully agree with the prosecutor's entirely race-neutral reason for back-striking the juror.    The trial court apparently recognized this and did not find it necessary to make any findings for the record in relation to the *Batson* test.    *See Snyder v. Louisiana*, 552 U.S. 472, 476-77, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (The three-part *Batson* test requires, first, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination).    On the showing made, Calderon has not established that he is entitled to federal habeas relief on this claim.

---

[27]  State Rec., Vol. 2 of 7, Voir Dire Transcript, pp. 159-60.

## RECOMMENDATION

For the foregoing reasons, it is **RECOMMENDED** that Calderon's application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.    28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[28]

New Orleans, Louisiana, this ___4th___ day of _____March_____, 2021.

MICHAEL B. NORTH
**UNITED STATES MAGISTRATE JUDGE**

---

[28] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.